IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY JOHNSON,<br><br>        Petitioner,<br><br>  v.<br><br>RAUL LOPEZ,<br><br>        Respondent.<br>                                   / | No. C 11-03530 SI<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |

**INTRODUCTION**

Anthony Johnson, an inmate of California State Prison, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition is DENIED.

**BACKGROUND**

The California Court of Appeal summarized the underlying facts of this case as follows:

A. *February 8, 2003 Incident*

    On the afternoon of February 8, 2003, E.B. was sitting in his car in front of his house on Page and Webster Streets. Appellant [petitioner Johnson] and codefendant Antonio Woods drove up and parked right behind E.B.'s vehicle. E.B. noticed their eyes were red. The two men walked toward Haight Street and approximately a half hour later they returned to the corner of Webster and Page. According to E.B., the two men were "yelling and using vulgarities about someone [who] had pissed them off." Something was said about "doing something to somebody." Woods told appellant that the gun was in the car. Appellant went to the car; Woods returned to the corner.

    Kevin Coleman arrived on the other side of the street. Woods and Coleman began arguing and yelling. Woods put his hands in the air and turned around in a circle; his shirt was open. They continued yelling. Eventually, Coleman crossed the street toward Woods. As Coleman approached Woods, Woods backed up toward where they parked their car. While they continued arguing, appellant proceeded along the wall of a building, crouching down with a gun between himself and the building. Appellant walked to a point behind Coleman and moved his arm in front of him with the gun.

Coleman turned around and appellant shot him in the chest. Coleman grabbed appellant by the hand that was holding the gun; they struggled. Coleman shoved appellant against the building. Appellant put his hand out and tried to shoot Coleman again but the gun jammed; he tried to unjam the gun. Coleman ran across the street and collapsed.

R.J. also witnessed the shooting as she walked on Page Street toward Webster. She heard a couple "pops" and saw two people struggling with a gun. She identified a picture of Coleman as the victim; he did not have a gun in his hand. The shooter waved a gun in his right hand as he struggled with Coleman. R.J. "saw the gun land on [Coleman]'s chest and he was shot point blank [in] the chest." Coleman walked across the street and collapsed. From what she could remember, the shooter started walking to the middle of the street and then got into a car and left the scene. R.J. identified appellant as the shooter during a "cold show" conducted by an officer that same day.

A.W. also observed the incident from her apartment on Page Street. She heard yelling, swearing and arguing. Looking out the window she saw two men fighting and pushing. She also saw a Volkswagen parked on the street.

A.W. saw one man pull his arm from his side; he had a gun that looked like a semiautomatic. He pointed the gun toward the other man and fired. The victim fell backward and tried to push his hand up. The gun, aimed at the man's chest, went off again. A.W. called 911. She never saw the victim holding a gun or knife.

Meanwhile, that afternoon Officers Damato, Ryan and Warnke were on patrol near Webster and Page. They observed a group of four to five African-American men walking northbound on Webster, and recognized codefendant Woods. Turning onto Page, the officers heard a gunshot and, accelerating toward Webster, heard two or three more. At the intersection of Page and Webster, the officers saw the group of men; appellant and Coleman were fighting. Officer Warnke saw appellant kneeling on the sidewalk, holding a black, semiautomatic handgun. He was manipulating the gun to work a jam or to reload. Officer Ryan also saw appellant holding a gun. Officer Warnke ordered appellant to drop the gun; when he turned around and spotted the car and the officers, he took off running. Officers Ryan and Warnke gave chase. Appellant threw the gun into a trash can at the corner of Page and Fillmore Streets. Ultimately the officers came upon appellant in a storage area behind a bar, where he surrendered. The officers did not notice any cuts, bruises or injuries on appellant.

Back at the patrol car, Officer Damato observed Coleman start to run, momentarily raise his hands, then collapse. He had been shot in the chest; there was no weapon in his hands or near him. Damato caught up with the other officers. He saw appellant come out of the storage area. He did not recall seeing any bruises or cuts on him.

Coleman died shortly after arriving by ambulance at the hospital. The autopsy revealed that Coleman died from multiple gunshot wounds, one of which entered his chest and exited through his back, doing the most damage to Coleman's major organs. Coleman's hand also sustained a gunshot injury, which appeared to be a defensive wound. The wound was inflicted from an intermediate range, from a few inches to a few feet away. According to the forensic toxicologist, traces of gunshot residue were found on appellant's hands, indicating he may have fired a gun, been in the vicinity of a fired gun, or touched something with residue.

The police retrieved the gun appellant threw in the garbage can; in the gun were a spent casing and four live rounds. The police also found a spent casing at the corner of Page and Webster. The firearms examiner concluded that the casing had been fired from appellant's gun. It was not possible that the cartridges could have been discharged from another firearm.

2

The jacket appellant was wearing when arrested contained baggies with cocaine, but no paraphernalia for ingesting drugs. The designated expert opined that he possessed the cocaine for sale.

Officer Walsh interviewed appellant the day he was arrested. He did not observe any injuries on appellant.[1] Appellant said he did not know why he had been arrested. When told he was arrested in relation to a fight on the streets that day, appellant replied he "ain't had no problems on no street." He said he hid from the police because of "[n]ervousness" about being chased by the police. Appellant denied possessing or firing a gun, or being near a gun that had been fired.

B. *Developments in 2004*

Floyd Coleman is Kevin Coleman's father. In 2004, Mr. Coleman heard "word on the streets"[2] and from Kevin's mother that appellant was going to plead guilty to voluntary manslaughter. Shaka called a second time telling him to meet a person on the corner of Page and Webster who would "give [him] the person that can be a witness to the homicide." At the appointed time he met a woman who pointed to a Volkswagen, indicating it was E.B.'s vehicle and he witnessed the shooting. Mr. Coleman and E.B. met. Mr. Coleman asked E.B. to "take the information that he had" to the police.

E.B. contacted the police after meeting with Mr. Coleman and spoke with Officer Walsh in July 2004.[3] E.B. explained that Mr. Coleman said the perpetrator "was trying to say that he shot Mr. Coleman['s son] in self-defense." E.B. gave his statement that it was not self-defense, "[b]ecause I was there."

Walsh testified that E.B. did not ask for any type of consideration. Further, he did not know at the time that E.B. was a registered informant.

C. *Defense*

Appellant testified that he grew up in the projects, dropped out of school in the 10th grade, and has been hustling--selling narcotics--since then. He knew of Kevin Coleman, describing him as a neighborhood bully. Appellant had seen Coleman beat up

---

[1] The police did not interview codefendant Antonio Woods until September 27, 2004. A videotape of the interview was played for the jury. Woods said he was in a store with his cousin when he heard his good friends, appellant and Kevin Coleman, arguing on the streets. Appellant was trying to get away from Coleman. Coleman was trying to "attack [appellant]. Not with no weapon just tryin' to get ahold to him." Woods heard two or three shots and saw appellant shoot Coleman in the chest, he guessed once or twice. He did not know from "where [appellant] got the gun." Woods denied any involvement in the shooting, and denied giving a gun to appellant or telling him where to find one.

[2] Apparently the information came from a telephone call by "Shaka," someone his son had introduced him to a couple of times.

[3] E.B. stated he did not immediately come forward on February 8, 2003, because he saw the chase, heard appellant had been arrested, and assumed he was "brought to justice." E.B. also testified that the police came to his house on May 19, 2004, in an unrelated investigation, searched his house, and found a gun and cocaine. E.B. was arrested. He did not tell the police anything about the Kevin Coleman homicide, or ask to have charges dropped if he cooperated in that case. In June 2004, E.B. agreed to be a police informant and provide information about a 2004 homicide. He did not contact the police about the Coleman murder until July 2004, following his meeting with the victim's father.

a guy and take his money. He also heard Coleman had been accused of attempted murder.

Appellant started the day of February 8, 2003, with a drink of gin, took one pill of ecstasy and smoked marijuana. The ecstasy made him "feel generated," "hiffy," like you "want to do a lot of things." The combination of the three made him feel good, like he wanted to do something. When he left the house he had two bags of crack cocaine, and planned to sell them on Haight Street; he was not carrying a weapon.

He remembered seeing Antonio Woods, whom he had known for a couple of years. He had another drink of gin, and at that point was a "little woozy," but "still normal."

While on the street that day, Coleman walked up to appellant, slapped and punched him and called him names. He also threatened to kill appellant. Appellant managed to cross the street, but Coleman came back and attacked again. Appellant was scared. Coleman hit appellant five to 15 times, under his right eye (leaving a bruise), on his cheek and on his jaw.

Appellant tried to flee again, but Coleman followed again, threatened to kill him and displayed a firearm in his waistband. Appellant reached for the gun; as they struggled, it went off. Appellant remembered one shot, but there could have been two. Johnson was told to freeze and drop the gun after it fired, but he was in shock and ran, throwing the gun into a trash can.

*People v. Johnson*, 2010 Cal. App. Unpub. LEXIS 2674, *2-*11 (Cal. Ct. App. Apr. 14, 2010) (footnotes in original).

## LEGAL STANDARD

This court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State Court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court may grant such a writ to a state prisoner only if the state court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States," or were "based on an unreasonable determination of the facts in light of the evidence presented" in the state court. 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle

4

1 from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case."
2 *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its
3 independent judgment that the relevant state-court decision applied clearly established federal law
4 erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal
5 habeas court making the "unreasonable application" inquiry should ask whether the state court's
6 application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

If a state court's ruling is found to be an unreasonable application of Supreme Court precedent, petitioner's conviction may only be overturned where that error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## DISCUSSION

### I.   Failure of *Batson* Motion During Voir Dire

Petitioner argues that his trial counsel failed to provide him competent assistance in defending the charges against him. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The essence of petitioner's grievance is that his trial counsel failed to adequately pursue a *Batson* motion alleging that the prosecutor pretextually challenged potential jurors because of their race. *Batson v. Kentucky*, 476 U.S. 79, 96 (1986). Petitioner asserts that his trial counsel failed to establish that the prosecutor systematically excluded potential African-American jurors from the jury panel after objecting to the dismissal of a prospective African-American juror. This claim was raised for the first time in the petition for writ of habeas corpus to the California Supreme Court. The California Supreme Court summarily denied the writ. *In re Anthony Johnson on Habeas Corpus*, S183876 (Cal. Feb. 16, 2011).

### A.   Factual Background

During voir dire, one of the prospective jurors brought up an incident where he was "falsely accused of robbery in Oakland because of mistaken identity and the officers were using excessive force on me and I was trying to tell them that it wasn't me." Ex. 3B at 124. The prospective juror also told the court that he could not follow a law he thought was unfair. *Id.* The trial court denied the prosecutor's challenge for cause as to this prospective juror because it found that the prospective juror

**United States District Court**
For the Northern District of California

1 could follow the court's instructions. *Id.* at 181. The trial court emphasized that it would be appropriate
2 for the prosecutor to use a peremptory challenge. *Id.*

3 The prosecutor used one of his peremptory challenges against the prospective juror. *Id.* at 183.
4 Petitioner's attorney brought a *Batson* motion regarding the challenge, noting that the prospective juror
5 represented 50% of all African-Americans in the pool. *Id.* at 184. The court found that counsel had
6 failed to state a prima facie case of discriminatory purpose as required under *Batson* and denied the
7 motion.

### B. Analysis

A charge of ineffective counsel requires that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that there is reasonable probability the result of the proceeding would have been different. *Strickland*, 466 U.S. at 667-68. Federal habeas review requires this Court to find that the state court's application of the *Strickland* standard was unreasonable. *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).

A *Batson* motion requires a three-step inquiry (*Rice v. Collins*, 546 U.S. 333, 338 (2006)):

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. [citations omitted]. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. [citations omitted]. Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices. [citations omitted]. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. [citations omitted]. This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." [citations omitted].

*Id.* Petitioner argues that his counsel was ineffective because he failed to make a prima facie showing that the prosecutor was challenging prospective jurors based on race by failing to show that the prosecutor was systematically excluding African-American jurors. Here, the trial court reasonably concluded that the prosecutor had not made a peremptory challenge based on race. The prospective juror's negative opinions of and experiences with the police in the past gave the prosecutor ample reason to challenge him. The court found that there was no basis for a *Batson* challenge at the first step in the

6

inquiry: petitioner's attorney failed to establish that the peremptory challenge was based on race. Petitioner's counsel therefore had no basis on which to compel the trial court to engage in analysis regarding the other two steps in the *Batson* analysis. On this basis, the California Supreme Court could have reasonably found that counsel's performance did not fall below "an objective standard of reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 667-68. Furthermore, petitioner cannot show that the result of the *Batson* motion would have been different had his counsel been allowed to develop the third element of the analysis. *Id.* Petitioner is not entitled to habeas relief on this claim.

## II.     Admission of Testimony Regarding Possible Plea and Claim of Self-Defense

Petitioner raises several constitutional challenges to testimony regarding petitioner's potential plea and claim of self defense.

### A.     Factual Background

During trial, the victim's father, Mr. Coleman, testified that he heard through "word on the streets" that petitioner was "going to plead to voluntary manslaughter." Ex. 4G at 399, 403-05. Mr. Coleman was upset by this news, so when he heard that there was a witness – Eugene Befford – to the shooting, he asked Mr. Befford to contact the police. *Id.* Mr. Coleman made reference in his testimony to a conversation with someone from the district attorney's office, who told him that petitioner was going to be charged with manslaughter rather than murder. Ex. 4G at 409-10. Mr. Coleman made no mention of proposed plea negotiations or agreements in his testimony. The defense made no objections to this testimony.

Mr. Befford testified that he contacted the police soon after speaking with Mr. Coleman. Ex. 4G at 415, 445. He testified that Mr. Coleman told him that petitioner was trying to say that he shot the victim in self defense. Ex. 4G at 416. He then testified that petitioner did not act in self-defense and that he knew this because he witnessed the crime. *Id.* The defense made no objections to this testimony.

**B.     Procedural Bar**

The court of appeal found that petitioner had forfeited his challenges to this testimony on appeal because he did not raise a contemporaneous objection at trial. A state court's procedural bar precludes petitioner from raising the claim on federal habeas. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). "If the court finds an independent and adequate state procedural ground, 'federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice.'" *Bennett*, 322 F.3d at 580 (citing *Noltie v. Peterson*, 9 F.3d 802, 804-05 (9th Cir.1993)). Petitioner has not shown that the introduction of this evidence resulted in prejudice or a miscarriage of justice. There is no indication that Mr. Coleman's statements prejudiced petitioner. They did not reveal details regarding petitioner's plea negotiations, they merely revealed rumors "on the street" and explained Mr. Coleman's and Mr. Befford's motivation in acting as they did in providing additional evidence to the police. Petitioner's claim is procedurally barred.

**C.     Admission of the Testimony Itself**

Even if petitioner's claim is not procedurally barred, admission of testimony regarding the plea agreements and the purported self-defense claim does not violate petitioner's Fifth and Sixth Amendment rights.

Regarding the admission of the potential plea agreement, petitioner first argues that admission of testimony regarding potential plea agreements violated his Fifth Amendment privilege against self-incrimination. The court of appeal rejected this claim, finding that the statements did not implicate the Fifth Amended because they were not admitted for the truth of the matter asserted and therefore not asserted against him. This decision is not unreasonable or contrary to established federal law. As noted by the court of appeal, contrary to petitioner's assertion, the testimony did not include statements made by petitioner during confidential plea negotiations. The statements at issue were based on rumors on

8

the streets, and the jury was never told that the statements were derived from plea negotiations. Furthermore, these statements were not offered for the truth of the matter asserted, but rather to explain the actions of Mr. Coleman and Mr. Befford. In sum, the testimony at issue was not based on statements made by petitioner and was not offered against petitioner.

Petitioner next argues that Mr. Coleman's knowledge of his potential plea and subsequent testimony regarding the plea breached his right to counsel under the Sixth Amendment because plea agreements are confidential. The court of appeal rejected this argument because there was no evidence that the prosecutor disclosed information regarding any plea negotiations. While it is true that Mr. Coleman testified – in response to questions posed by counsel for petitioner's co-defendant – that he talked to two district attorneys who told him "it was going to be a manslaughter charge instead of a homicide," the court found that these statements reveal nothing about private plea negotiations. Petitioner has not established that the court of appeal's ruling was contrary to or an unreasonable application of Supreme Court precedent. 28 U.S.C. § 2254. Furthermore, given the insignificance of the challenged testimony to petitioner's conviction, its admission could not have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

Petitioner also argues that the admission of testimony regarding a potential plea violates his due process rights under the Fifth and Fourteenth Amendments. Mr. Coleman's testimony regarding the statements made by the "district attorneys" did not reveal that petitioner had offered to plead guilty to manslaughter. It merely revealed that the district attorney was possibly considering a charge of manslaughter. The court of appeal reasonably found no violation of due process. Furthermore, petitioner cannot show that the trial court's failure to exclude these statements had a "substantial and injurious effect or influence in determining the jury's verdict." *Id*.

As to the testimony regarding petitioner's purported self-defense claim, petitioner asserts that admission of the statements that he was claiming self-defense lightened the prosecution's burden at trial. The court of appeal noted that petitioner did in fact claim self-defense at trial and that testimony regarding rumors of petitioner's legal strategy played an insignificant part in the case against him given the overwhelming evidence in the record. The court of appeal's conclusion that any statements regarding the self-defense claim did not lighten the prosecution's burden was not contrary to or an

9

1 unreasonable application of Supreme Court precedent.

2 Finally, petitioner argues that admission of statements regarding the purported plea agreement
3 and the claim of self-defense were admitted in violation of the hearsay rule and violated his
4 confrontation clause rights under the Sixth Amendment because he did not have the opportunity to
5 cross-examine their declarants. The court of appeal held that these statements did not constitute hearsay
6 or implicate the confrontation clause because they were not admitted for the truth of the matter asserted.
7 *See, e.g., Tennessee v. Street*, 471 U.S. 409, 414 (1985). The court of appeal reasonably found no
8 hearsay or confrontation clause violations because the statements regarding the purported plea deal were
9 not admitted for the truth of the matter asserted, but to show the witnesses' motivations for their actions.

### D.     Ineffective Assistance of Counsel/Failure to Object

12 Petitioner argues that his trial counsel's failure to object to witness testimony regarding the plea
13 and self-defense claim resulted in ineffective assistance of counsel. *Strickland*, 466 U.S. at 667-68. As
14 noted above, a charge of ineffective counsel requires that counsel's performance fell below an objective
15 standard of reasonableness under prevailing professional norms, and that there is reasonable probability
16 the result of the proceeding would have been different. *Id*.

17 The court of appeal found petitioner's counsel not "deficient" under *Strickland* because there
18 was no objection he could make to the testimony, and because the statements at issue "were minor . .
19 . in the context of the trial." *Johnson*, 2010 Cal. App. Unpub. LEXIS 2674 at *22. The court of
20 appeal's determination that petitioner's counsel did not give ineffective assistance was a reasonable
21 application of established Supreme Court law because the objections at issue would likely not have been
22 granted, and the evidence admitted can not be shown to have been to petitioner's conviction.

### III.    Admission of Testimony Regarding Another Witness to the Crime

25 Mr. Coleman testified that he learned about the existence of the eyewitness Mr. Befford through
26 the victim's friend and through his son's mother. Petitioner claims his confrontation rights were
27 violated because he was unable to confront the victim's friend and mother regarding these statements.
28 The court of appeal found these statements non-testimonial, and therefore they did not implicate the

confrontation clause. Statements made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" are testimonial. *Crawford v. Washington*, 541 U.S. 36, 51 (2004). Stated differently, testimony "is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* The testimony at issue here is a revelation that there was an additional eye witness to the shooting. This evidence was not used to establish a fact against the defendant, but rather to establish a motive for the conduct of a prosecution witness. Therefore, the court of appeal reasonably concluded that it was not testimonial for purposes of the confrontation clause. Furthermore, given the insignificance of the contested evidence to petitioner's conviction, its admission cannot be shown to have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

**IV.     Exclusion of Statements by Co-Defendant and Unnamed Informant Regarding Petitioner's Use of Ecstasy**

Petitioner argues that the trial court violated his right to present a defense by excluding statements that petitioner was under the influence of ecstasy when he shot the victim.

### A.     Factual Background

A confidential informant gave a statement to the district attorney regarding the shooting. In that statement, the informant revealed that petitioner was high on ecstacy during the incident. The informant knew this because he was in a car with petitioner the morning of the incident. Respondent's Exhibits Lodged in Support of Answer to Petition for Writ of Habeas Corpus ("Ex.") 1A at 287. The informant did not witness the incident. Before trial, petitioner moved to discover the identity of the informant so that he could testify to the fact that petitioner was under the influence of ecstasy. The trial court denied the motion on the grounds that the informer was not a percipient witness to the events leading up to the homicide and "that there is no reasonable possibility that non-disclosure of the informer might deprive the defendant of a fair trial." Ex. 4D at 201-02.

Petitioner immediately moved to sever the trial of co-defendant Woods on the grounds that Woods was the only remaining source of information to corroborate the fact that petitioner was on a

1 "powerful narcotic" at the time he shot the victim. *Id.* at 202. The motion was denied. Petitioner testified at trial that on the morning of the shooting he took one pill of ecstasy and elaborated on how that made him feel. Ex. 4N at 899-900. Petitioner also stated that he was still normal before the shooting and that he took ecstasy "like every other day." Ex. 4N at 929-900.

### B.     Analysis

In a criminal trial the accused has the right to "put before the jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). Petitioner argues that his inability to corroborate his testimony regarding the influence of ecstasy violated this right. The court of appeal held that petitioner's right to present evidence was not violated for three reasons. First, petitioner did not need to corroborate the fact that he was on ecstasy. The prosecutor did not dispute petitioner on this point. *See* Johnson, 2010 Cal. App. Unpub, LEXIS 2674 at 24-25. Second, petitioner never attempted to bring the informant's statement regarding his use of ecstasy into evidence although it was certainly within his ability to do so. *Id.* Finally, the court of appeal found that evidence of intoxication could not lead the jury to conclude that petitioner lacked the requisite mental state for first degree murder. *Id.*

The court of appeal's decision was not contrary to or an unreasonable application of Supreme Court precedent. Petitioner's testimony at trial that he was under the influence of ecstasy and other substances was uncontroverted and petitioner was not prevented from introducing the informant's statements at trial.

### V.     Admission of Testimony Regarding Use of Firearms

Petitioner contends that admission of evidence regarding his knowledge and use of firearms violated his constitutional rights.

### A.     Factual Background

At trial petitioner claimed that he was not armed with a gun before the shooting. Ex. 4N at 900, 912. He claimed that the victim was carrying a gun and that it accidentally went off during the struggle.

*Id.* at 913-918. Other witnesses testified differently. Mr. Befford testified that petitioner obtained a gun before the shooting, raised it at the victim, and shot him in the chest. Ex. 4G at 420-21. He testified that petitioner attempted to shoot again, but the gun jammed, so he attempted to unjam it by cocking it. *Id.* at 430-31. Another witness testified that she saw petitioner shoot point blank at victim's chest. Ex. 4I at 539, 541. A third witness said she saw two men arguing and that one pulled out a gun and fired at the other's chest. Ex. 4L at 711-30.

During his testimony, petitioner stated that he had never fired a gun, but admitted that his hand was on the trigger of the gun during the struggle, that he knew the difference between a semi-automatic and revolver, and knew how to clear a jam on a semi-automatic. Ex. 4N at 936, 944.

### B. Analysis

Petitioner claims that the state court violated his constitutional rights by allowing the prosecutor to impeach him regarding his knowledge of guns. To warrant habeas relief, the questioning of a witness must have been "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). The witness's testimony should be viewed as a whole and in the larger context of the trial to determine the impact of the alleged improper questioning. *Id.* at 934-35.

Whether the gunfire was accidental or intentional was a central disputed issue over the course of the trial. The court of appeal reasonably found that the prosecutor's questioning regarding petitioner's knowledge and use of guns was relevant to this disputed fact. This determination was not contrary to, or an unreasonable application of Supreme Court law.

## VI. Exclusion of Testimony Regarding Victim's Gang Membership

Petitioner argues that the exclusion of evidence regarding the victim's gang membership violated his constitutional rights.

### A. Factual Background

Before trial the prosecutor moved to exclude any evidence regarding gang activity of the victim

13

and defendants. Ex. 4B at 110. The trial court reserved ruling on the motion but cautioned that there would be no reference to gang activity until it ruled otherwise. Ex. 4B at 112. Neither party attempted to introduce evidence of gang membership at trial or asked the court to rule on the motion.

### B.     Analysis

The court of appeal found that petitioner's failure to obtain a final ruling on this issue foreclosed him from complaining of "some hypothetical error the trial court had no opportunity to correct." *Johnson*, 2010 Cal. App. Unpub. LEXIS 2674 at *28. Petitioner objected to the prosecution's motion and the trial court never ruled on it. Petitioner had the opportunity to attempt to bring in evidence regarding victim's gang affiliation but never did so. The court of appeal's determination that petitioner could not complain that exclusion of evidence he never even attempted to introduce violated his constitutional rights was not contrary to or an unreasonable application of Supreme Court law.

## VIII.  Dismissal of Juror Number Nine

Petitioner asserts that his constitutional rights were violated when the trial court dismissed Juror Number Nine during deliberations and when the juror was questioned and excused outside petitioner's presence.

### A.     Factual Background

After the jury was excused to deliberate, the trial court asked if petitioner's appearance could be waived until further requested. Petitioner indicated that he wished to remain upstairs until his presence was necessary, including for matters related to answering questions from the jury or dealing with issues other than the verdict. Ex. 4Q at 1092. At the end of the first day of deliberations right before the court excused the jury, Juror Number Nine asked if he could address the court. He stated "well, it seems though I disagree with all the others–" but was interrupted by the court before he could say anything about the content of deliberations. Ex. 4Q at 1095.

The next morning, the court and counsel met in chambers with Juror Number Nine. Both defense attorneys waived their clients' presence. Ex. 4R at 1101. Juror number nine stated:

14

> I don't know how to explain, but I can tell you I was highly disturbed yesterday when I came home. My blood pressure was over 200 and 100. And my pulse, heart beat, was over 120. And then I took some – my wife is a retired physician. We have everything in the house for that. And well I cannot stand how people in this room are reasoning. I cannot explain it if I don't talk to you about what is happening.

*Id.*

The Court inquired further into Juror Number Nine's physical condition. Juror Number Nine stated that the deliberations were making him sick and that he had chest pains twice during the first day of deliberations. *Id* at 1105. He stated that he was participating in deliberations and following the instructions that the court gave the jurors. *Id*. He stated that his health conditions would suffer if he continued in his deliberations. *Id*. After this discussion, the court noted that the juror indicated he was participating in the deliberative process with the other jurors and that at several times during the discussion he had his hand clutched to his chest. This, to the court, indicated a serious health risk to Juror Number Nine. The court found that the juror was physically unable to perform the duties of a juror and excused him. *Id.*

### B.    Analysis

The court of appeal held that Juror Number Nine was properly dismissed by the trial court because the record did not indicate that Juror Number Nine was a holdout juror deadlocking the jury, that the trial court's in depth inquiry as to the cause of Juror Number Nine's distress revealed that health issues prevented him from continuing in the deliberative process, and that the trial court properly dismissed him from the jury due to concerns for his health and safety. *Johnson*, 2010 Cal. App. Unpub. LEXIS 2674 at *35-37.

A necessary condition for federal habeas relief is that the state court's decision be "contrary to, or involv[e] an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States.*" *Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005) (citing 28 U.S.C. § 2254(d)(1)) (emphasis added). Even assuming that Juror Number Nine was a holdout juror, the Supreme Court has never held that dismissal of a holdout juror violates the Sixth Amendment right to a unanimous verdict for every criminal conviction. Because the Supreme Court has never established

precedent on this issue, the court of appeal's holding that trial court's dismissal of juror number nine did not violate the Sixth Amendment was not contrary to or an unreasonable application of clearly established Supreme Court precedent. *Kane*, 546 U.S. at 10.

Petitioner also argues that a criminal defendant has the right to be present at all stages in his proceedings and that his absence when Juror Number Nine was dismissed violated his constitutional rights. The court of appeal held that petitioner's right to be present at his trial only applies if his presence "bears a reasonable and substantial relation to his full opportunity to defend against the charges," that petitioner's waiver of his right to be present "strongly indicates" that his presence did not bear such a substantial relationship, and that in fact his absence did not prejudice his ability to fully defend against the charges brought against him. *Johnson*, 2010 Cal. App. Unpub. LEXIS 2674 at*40-41. The United States Supreme Court has held that a defendant is entitled to be present when "his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934). Here, petitioner specifically waived his right to be present and there is no suggestion as to why his presence was necessary or would have been helpful at the time. Hence, the court of appeal's decision was not clearly contrary to or an unreasonable application of U.S. Supreme Court precedent.

## CONCLUSION

For the reasons stated above, the petition for writ of habeas corpus is hereby DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: July 10, 2012

SUSAN ILLSTON
United States District Judge